## MAKIVER v. MISSOURI STATE LIFE INS. CO.

## SAME v. EQUITABLE LIFE ASSUR. SOC. OF THE UNITED STATES.

(District Court, E. D. Pennsylvania. March 19, 1924.)

### Nos. 9898, 9900, 9902, and 9904.

Evidence ☞123(10)—Wife's declarations held not admissible as part of res gestæ relating to shooting of insured by her.

While insured was in his office with his stenographer, a young woman, his wife entered and without warning shot both of them; insured dying in a few hours. The wife left the office, but returned after the arrival of an officer and stated to him that she did it and must have been crazy. She also said to her husband, "I am sorry; I am sorry." She was hysterical and excited. Later, in the presence of others, she said "they," meaning her husband and the stenographer, had been running around together, and that she "caught them in the act"; also that she was intoxicated. Held, that the declaration that she caught them in the act, made, as it was, after a considerable time, and after she had been away, was not admissible as part of the res gestæ, in support of the defense that the death of insured resulted from violation of law, which invalidated the policies under their terms.

At Law. Actions by Harry J. Makiver, administrator pendente lite of the estate of Oscar W. R. Rosier, deceased, against the Missouri State Life Insurance Company, and against the Equitable Life Assurance Society of the United States. On motions by defendants for new trial. Denied.

William T. Connor, of Philadelphia, Pa., J. B. Hannum, of Chester, Pa., and Allen S. Morgan and Thomas S. Lanard, both of Philadelphia, Pa., for plaintiff.

Robert J. Sterrett, of Philadelphia, Pa., for defendants.

Before THOMPSON, DICKINSON, and McKEEHAN, District Judges.

THOMPSON, District Judge. These suits were all brought by Harry J. Makiver, administrator pendente lite of the estate of Oscar W. R. Rosier, deceased, to recover upon four policies of insurance against the death of the insured by accident. The policies all insure against loss of life resulting from bodily injuries, effected directly and independently of all other causes, solely through accidental means, and in all excepting that in No. 9898 are provisions to the effect that the agreement to pay the amount named in the event of death does not include death resulting from any violation of law. Rosier's death occurred as follows: While he was at his place of business at 1314 Walnut street, Philadelphia, on the afternoon of January 21, 1922, his wife, Kathryn Rosier, entered suddenly, and unexpectedly, without warning of any kind, instantly shot the insured with a pistol, causing a wound from which he died within a few hours.

The defense set up is that Rosier's wife discovered him in the act of adultery with one Mildred Reckitts, and was thereby inflamed into a condition of violent rage, which caused her to shoot her husband and Miss Reckitts, and therefore his death was not accidental, but

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

the result of his own unlawful act. It was shown that the insured had offices on the third floor of the building, at No. 1314, on the south side of Walnut street; the entrance to his private office in the front of the building being through an outer office.

The uncontradicted testimony shows that Police Officer Samuel Cates entered the offices alone immediately after the shooting—about 20 minutes to 3 o'clock. When entering, he did not see anybody as he went through the outer room. Upon entering Rosier's private office, he found Rosier and Miss Reckitts wounded; Rosier lying upon the floor and Miss Reckitts lying upon a couch. In the outer room he found a revolver, from which four shots had been fired. He asked Miss Reckitts who shot her, and she said she did not know; he asked Rosier who shot him, but he would not answer; he merely moaned. Just as he was about to telephone, he heard footsteps and Mrs. Rosier walked in. She was nervous, excited, and hysterical; he asked her who did it; she said, "I did it; I must have been crazy." Q. "What else did she say at that time?" A. "She swooned, and I sat her down on a chair there."

Another officer, John A. Cummings, came in after Mrs. Rosier had returned. The testimony of Cummings shows that when he arrived Rosier was lying on the floor with a bullet wound right under his heart; that Mrs. Rosier was there and the Reckitts girl. He asked Rosier who shot him, but he could not speak; he just threw his eyes across the room at Mrs. Rosier. At that time there was no one else there, except Officer Cates, a colored man, Officer Toner, and Officer Gorman. This was about 2:45 p. m. The couch upon which Miss Reckitts was lying was on the south side of the room. Mrs. Rosier was sitting at a desk in the center of the room; she was crying and "hollering" for some one to phone to her mother in Atlantic City. She was hysterical and excited. At that time she walked over to her husband and said: "Daddy! Daddy! Why did you die? I am sorry; I am sorry."

For the defense it was shown that Paul M. Gottlieb, with Norman McLeod, newspaper reporters, arrived at the building shortly after the shooting, and waited on the stairs between the second and third floor landings until the police arrived before going into the offices. They went in behind the policemen, and saw Rosier and Miss Reckitts lying as described by Cates and Cummings. Mrs. Rosier was at some place in the office, but he did not observe her condition at that time. They were there altogether about 15 minutes. Mrs. Rosier was brought into the back office by a policeman, and they got her some water. She began crying and sobbing and was excited. Gottlieb's testimony as to what was said at that time by Mrs. Rosier was admitted under objection and exception, and was finally answered as follows:

"Witness: I asked her why she had shot these people, Miss Reckitts and her husband, and she said, 'When I was in Hahnemann Hospital, having my baby, they were running around together. To-day I come in and caught them right in the act.'"

He further testified that, after she told them about the shooting, she said, "I was intoxicated."

Harold G. Layton, a newspaper reporter, who came upon the scene of the shooting after Gottlieb, at a time fixed by him as between 3:15 and 3:20 p. m., testified that, when he arrived there, no one was in the outer office, but there were several officers and two newspaper men, Norman McLeod and Paul Gottlieb, in the front room, Mrs. Rosier, Miss Reckitts, and Mr. Rosier. Miss Reckitts was lying on the couch alongside of the door, which he entered from the waiting room. Mrs. Rosier was distraught and hysterical, and he did not talk to her at that time. She was in a state of hysteria, and was crying in dry sobs, and in general acting as though she was out of her mind temporarily. She was attempting to get a number out of the telephone book; she wanted some one to call up and notify her mother. Layton knew nothing of what occurred in the front room until Officer Cates brought Mrs. Rosier out; they were then taking Miss Reckitts and Rosier down stairs, and left Mrs. Rosier with Layton. After the bodies had been removed, Officer Cates sat him in a chair and told him to stay there. Under objection and exception, the witness testified that he had been ordered to get a story, and began to cross-question Mrs. Roiser, and elicited this from her: She was pacing up and down the room, crying out, "I caught them in the act; I loved him, and to save him." The woman evidently assumed he was a doctor, and he did not disabuse her mind of that fact. The idea was to get the story. She referred to a diary she had found in Miss Reckitts' purse. He asked her who this woman was; she said, "Mildred Records, his stenographer." "They have been running around, running around, while I had my baby in the Hahnemann Hospital, and I caught them in the act." She reiterated that a half a dozen times.

The evidence of the declarations of Mrs. Rosier to Gottlieb and Layton is relied upon by the defendants to prove the fact that Mrs. Rosier shot her husband and Miss Reckitts upon detecting them in the act of adultery. The testimony was offered and admitted as part of the res gestæ. After the testimony was closed, a verdict was directed in each case for the plaintiff, upon the ground that under the evidence he was entitled to recover by reason of the death of the insured resulting from an accident.

After a careful consideration of the circumstances, we are of the opinion that the declarations made by Mrs. Rosier to Mr. Gottlieb and Mr. Layton were not admissible as part of the res gestæ. It was shown that after the shooting she had left the offices, and that after Officer Cates arrived and she returned she stated to him, while in the room where the wounded persons lay, that she did it and must have been crazy. She also made the exclamation to Rosier while he was lying wounded, "Oh, Daddy! Oh, Daddy! why did you die? I am sorry; I am sorry." In neither of these declarations did she state the fact which the defendants relied upon to establish their defense. It is apparent that she then had time for reflection, and that the later declarations made by her were not made with the spontaneity and the absence of the presumption or probability; that she was actuated by self-interest, required by the res gestæ rule. She had made her statement to the officers of the law after having left the officers after the shooting and having returned. The statement to Gottlieb that she was

intoxicated, and to both him and Mr. Layton that she caught them in the act, accompanied by the narration of what had occurred while she was in the Hahnemann Hospital, are obviously susceptible of the inference that, upon realizing the situation she was in, with the charge of double murder confronting her, she had a self-serving purpose of defense and justification in declaring that she caught them in the act, and that she was intoxicated. In Commonwealth v. Werntz, 161 Pa. 596, 29 Atl. 273, Mr. Justice Mitchell said:

"No fixed measure of time or distance from the main occurrence can be established as a rule to determine what shall be part of the res gestæ. Each case must necessarily depend on its own circumstances, to determine whether the facts offered are really part of the same continuous transaction."

The continuity of circumstances in the present case is not such, in our opinion, as to justify the admission of the declarations in question as part of the res gestæ.

There being no competent evidence of the fact set up in defense, the motions for a new trial are denied.